## INDEPENDENT SCHOOL DISTRICT NO. 561, PENNINGTON AND MARSHALL COUNTIES, AND ANOTHER v. INDEPENDENT SCHOOL DISTRICT NO. 35 AND OTHERS.

170 N. W. (2d) 433.

August 29, 1969—Nos. 41464, 41548.

*James E. Knutson* and *Peterson & Popovich*, for appellants.
*Herbert E. Olson* and *Olson & Kief*, for respondents.

NELSON, JUSTICE.

Independent School District No. 561, Pennington and Marshall Counties, and Independent School District No. 440, Marshall County, appeal from a judgment of the Beltrami County District Court holding valid an order issued by the county superintendent of schools for Beltrami County on July 30, 1964, consolidating Independent School District No. 35 (the Grygla school district) and Independent School District No. 438 (the Gatzke school district) of Beltrami and Marshall Counties, and a part of Independent School District No. 685 (the Skime school district) of Beltrami, Marshall, and Roseau Counties. Districts No. 561 and No. 440 also appeal from an order of the Beltrami County District Court denying their motions for an order amending the findings of fact and conclusions of law entered October 27, 1967, and for a new trial. The appeals were consolidated for hearing by order of this court.

The Grygla, Gatzke, and Skime school districts do not maintain high schools, but each maintains its own elementary school. At the time of the order for consolidation, and for several years prior thereto, most of the Grygla secondary pupils received their secondary education at appellant District No. 561 (the Goodridge school district) ; the Gatzke secondary pupils at appellant District No. 440 (the Middle River school district) ; and the Skime secondary pupils at Roseau. A few of the secondary pupils from these areas went to high school at Thief River Falls, Crookston,

and other secondary centers. While both the Goodridge and Middle River districts have a six-six program, the students from Grygla and Gatzke spend eight years in elementary school and four years in a secondary school.

The problem of transporting high school pupils from the Grygla district to the Goodridge district has been the concern of the people of the Grygla district for years. Some high school pupils are picked up between 6:45 a. m. and 7 a. m. and are required to ride buses until about 8:30 a. m. In some cases, the high school students have to transfer from one bus to another. These same pupils are not returned to their homes until 5 p. m. to 7:30 p. m. Buses transporting these high school pupils travel from 45 to 58 miles one way. Transportation aids returned to the Grygla district in many cases have represented less than 50 percent of the operating costs with the difference borne by the taxpayers. If additional feeder routes were to be added to eliminate some of the long bus rides, the extra costs would be 100 percent nonreimbursable since the Grygla district is already spending more than the maximum aid that can be returned.

Shortly after the original Reorganization Act of 1947, L. 1947, c. 421, survey committees were established in Beltrami and Marshall Counties. Since the activation of the first survey committee, the need for a high school in the Grygla area has been recognized. The State Department of Education recommended that before any attempt was made to establish a high school for the Grygla area it would be desirable to develop a satisfactory elementary attendance center. The people of that area reacted to this recommendation favorably, resulting in the Grygla district's building a modern elementary plant in the late 1950's. In the construction of this plant, a gymnasium was included which met the standards for a high school and the former auditorium was remodeled to provide a cafeteria. An extra class room was included beyond what was needed for the eight elementary grades, and the power plant was so constructed that additional heating facilities could be built in with a minimum of space and

expenditures. At the time the elementary plant was planned and constructed, the people of that district had in mind that there would be secondary school facilities available within a few years. Consequently, when this secondary education center is established, some of the necessary facilities will already be available. This should also eliminate an excessive bond sale. The Grygla district also secured additional acreage for the present facilities, thereby removing the problem of not having a site of sufficient area.

Following through with the determination of the Grygla and Gatzke districts to have a more centrally located secondary school and one which the people in these districts would govern, John Pearson, county superintendent of schools for Marshall County, in 1961 prepared a plat pursuant to the provisions of Minn. St. 1961, § 122.23, subd. 2, proposing to consolidate the Grygla and Gatzke districts. This plat was rejected by Erling O. Johnson, then commissioner of education, on March 14, 1962, on the ground that the plat was drawn by the wrong superintendent of schools, inasmuch as Beltrami County had the "greatest land area" within the area proposed to be consolidated. In rejecting this plat, Mr. Johnson suggested that the school survey committee of Marshall County "take the initiative in the study of the present school situations and conditions of these areas." He also suggested that the Marshall County survey committee solicit the cooperation and assistance of similar committees from Beltrami, Roseau, and Pennington Counties.

Following the suggestion of the commissioner of education, the survey committees of Beltrami, Marshall, and Roseau Counties were reactivated. The committees then considered all factors and conditions having a bearing on the overall recommendations for education for the affected area in these counties. These committees also visited and received information relevant to the Goodridge and Middle River schools. The Pennington County survey committee was not invited to participate in the evaluation made by the survey committees of the other counties,

although Dr. David Brown, superintendent of the Goodridge district and executive secretary of the Pennington County school district survey committee, was invited to and did attend some of the survey committee meetings. Respondents state in their brief that this was also true of the superintendent of the Middle River district. They were free to and did voice their suggestions and recommendations.

In March 1964 the survey committees forwarded their combined tentative report to the Department of Education. This report shows that the committees had obtained and studied the following financial factors concerning the territory proposed to be included in the new consolidated district: The assessed valuation of the proposed area; E. A. R. C. adjusted assessed valuation; enrollments; estimated aids; estimated costs; estimated net costs to local taxpayers; estimated tax rate; the bonding power of the new district. Based upon a projection of enrollment trends made by the committees, the new district would meet the minimum enrollment recommendations of the board of education for a six-year secondary school. The committees also made an analysis of the population trends from 1940 to 1960 within the various portions of Marshall, Beltrami, and Roseau Counties proposed to be included within the new consolidated district.

The committees thoroughly considered all factors they felt were relevant and necessary in order to come up with the best possible solution of the problems of educating the students in this area. The ultimate conclusion of the committees was that consolidating the Grygla district, the Gatzke district, and a part of the Skime district into one large school district, and eventually building a secondary school at Grygla, was the best solution.

Public meetings were held by the joint survey committees at Grygla, Gatzke, and Skime to explain the report and the consolidation proposal to the people. The State Advisory Commission on School Reorganization held a hearing on this report March 4, 1964, at which time the report and recommendations of the school survey committees were considered. The school survey

committees from Beltrami, Marshall, and Roseau Counties were represented at this hearing. Dr. Brown, superintendent of schools at Goodridge, was aware of the meeting but did not recall attending it. Mr. Stapleton, county superintendent for Beltrami County, presented the report.

On May 12, 1964, the school board of the Grygla district passed a resolution stating that it was its desire to consolidate with the Gatzke district and part of the Skime district, as described in the tentative report. The resolution requested Mr. Stapleton to prepare a plat of that area for consolidation.

After receiving a certified copy of this resolution, Mr. Stapleton, acting under and pursuant to Minn. St. 1961, § 122.23, subd. 2, prepared a consolidation plat of the area. He also prepared a supporting statement, and on May 22, 1964, mailed the original of the plat, along with the supporting statement, to Mr. Johnson, the commissioner of education. After receiving this plat, the commissioner referred the same to Theodore C. Engum, chief of the elementary and secondary education section, for study by the personnel in the Department of Education concerned with the reorganization and consolidation of the school districts.

On June 23, 1964, a hearing on this consolidation plat was held in St. Paul, the commissioner of education presiding. This hearing was attended by both proponents and opponents of the consolidation plat, including Dr. Brown, and everyone was given an opportunity to be heard. The plat was approved by the commissioner of education June 26, 1964, and returned to Mr. Stapleton. On the plat, the commissioner of education endorsed his reasons for its approval:

"(1) It will enable the residents within the proposed new district to determine by referendum whether or not this district shall be formed. (2) The formation of such new district will provide the people of this area an opportunity to participate in the government and management of the district and of the schools in which their children will be enrolled. (3) Such proposed district will have the privilege to establish and maintain a compre-

hensive program of education from grades 1 through 12 and also will coordinate and unify the administrative procedures and services for this area including the transportation of pupils."

After the return of the plat, an election was held July 28, 1964, for approval or disapproval of the consolidation plat, the results of which were as follows:

| District | For Consolidation | Against Consolidation |
|---|---|---|
| Grygla | 454 | 50 |
| Gatzke | 94 | 89 |
| Skime | 37 | 1 |
| | 585 | 140 |

On July 30, 1964, Mr. Stapleton issued an order for consolidation of the area, effective July 31, 1964. An appeal from this order was taken to the Beltrami County District Court by the present appellants and three residents of the Gatzke district pursuant to Minn. St. 127.25, subd. 1. The Gatzke and Grygla districts were permitted to intervene pursuant to § 127.25, subd. 2.[1]

The notice of appeal stated that it was taken on the grounds that the county superintendent had no jurisdiction to act; that he exceeded his jurisdiction; that the actions of the superintendent and the commissioner of education were arbitrary, capricious, oppressive, and in unreasonable disregard of the best interests of the territory affected; and that the consolidation order is based on an erroneous theory of law.

The trial court held the consolidation order valid, finding that the county superintendent had jurisdiction to act; that he had not exceeded such jurisdiction; that his actions and those of the commissioner of education were not arbitrary, capricious, oppressive, nor in unreasonable disregard of the best interests of the territory affected; and that their actions were not based upon an erroneous theory of law.

---

[1] See, In re Appeal of Lego v. Rolfe, 268 Minn. 483, 492, note 6, 129 N. W. (2d) 811, 818, note 6.

On appeal, it appears that appellants have now abandoned the first two grounds urged on their appeal to the district court and rely only on the last two in asking this court to declare the consolidation invalid.

■ Before reaching those issues we are first concerned with the scope of review by this court in this appeal. It has been held that in consolidation proceedings the powers exercised by the county superintendent of schools and the commissioner of education are legislative in character. See, Bakken v. Schroeder, 269 Minn. 381, 130 N. W. (2d) 579; In re Appeals of Schluter, 273 Minn. 386, 141 N. W. (2d) 482.

In In re Dissolution of Independent School Dist. No. 27, 240 Minn. 257, 260, 60 N. W. (2d) 617, 619, quoted in In re Appeal of Lego v. Rolfe, 268 Minn. 483, 129 N. W. (2d) 811, this court said:

"The scope of our review on an appeal of this kind is governed by our statute and our decisions construing it. That the action of a county board in dissolving a school district, as well as in attaching it to another district, is legislative in character is now so well established that it needs no citation of authority. A review of such action by the court is limited by statute to a much narrower scope than review in an ordinary civil action. This court, as well as the trial court, must limit its inquiry to a consideration of whether the action of the county board was arbitrary, oppressive, unreasonable, or fraudulent or based upon an erroneous theory of law. * * * We will not reverse merely because we disagree with the honest exercise of judgment by the county board.

"The wisdom of the statute involved is not a matter for judicial determination."

■ In Walters v. Common School Dists. 265 Minn. 284, 287, 121 N. W. (2d) 605, 608, this court stated:

"* * * While the best interests of the territory affected is a vital factor in proceedings to effect school consolidation, it is not a matter for the courts to consider on appeal."

■ In In re Appeals of Schluter, 273 Minn. 386, 388, 141 N. W. (2d) 482, 484, this court further said:

"The action of the county superintendent and the commissioner of education in ordering consolidation is a legislative one which the courts will not set aside unless it is not exercised in good faith and constitutes an abuse of discretion. Before the courts may interfere, there must be a showing that the order was fraudulent, arbitrary, oppressive, and in unreasonable disregard of the best interests of the territory affected."

■ We are unable to agree with appellants' contention that the county superintendent of schools and the commissioner of education acted under an erroneous theory of law. When Mr. Stapleton received the resolution in this case, Minn. St. 1961, § 122.23, subd. 2, provided that upon his own initiative, upon receipt of a resolution of a school board in the area proposed for consolidation, or upon receipt of a petition executed by 25 percent of the resident voters in the area proposed for consolidation, or by 50 such voters, whichever is lesser, the county superintendent "shall cause a plat to be prepared." Appellants argue that Mr. Stapleton "was under the misconception that he was obligated to submit in total the proposed consolidation plat recommended by the Grygla school board."

Once Mr. Stapleton had received the resolution from the Grygla school board, it is questionable whether he had the authority to change the area for which the consolidation plat was requested in the absence of another request for a plat involving parts of the same districts as those to which the Grygla board's resolution related. In such case, "he shall prepare a plat which in his opinion best serves the educational interests of the inhabitants of the districts or area affected." § 122.23, subd. 2. However, it would be of academic interest only to argue what authority Mr. Stapleton had to change the area proposed for consolidation. The entire question is rendered moot and without practical value since his testimony was that he attempted to com-

ply with the resolution and there is no showing elsewhere in the record that he even considered altering in any way the boundaries of the area proposed for consolidation in the resolution.

Appellants also claim that the commissioner of education was "not obligated to either approve or disapprove the consolidation plat submitted to him for review." They ignore the language of § 122.23, subd. 6, which states that the commissioner "shall, upon receipt of a plat, forthwith examine it and approve, modify, or reject it"; that he "shall endorse thereon his reasons for his actions"; and that he "shall return it to the county superintendent who submitted it." While the commissioner has the power to modify a plat which has been submitted to him, as does the county superintendent of schools in certain circumstances, those facts do not in our view transform the mandatory provisions of the statute in question into a mere directive.

We think, as argued by respondent-intervenor, that the meaning of these provisions turns on the definition of the word "shall." When used in statutes, contracts, or the like, the word "shall" is generally imperative or mandatory. See, McDunn v. Roundy, 191 Iowa 976, 181 N. W. 453; United States v. 267 Twenty Dollar Gold Pieces (W. D. Wash.) 255 F. 217. See, also, People v. O'Rourke, 124 Cal. App. 752, 758, 13 P. (2d) 989, 992, wherein it was stated:

"* * * In common, or ordinary parlance, and in its ordinary signification, the term 'shall' is a word of command, and one which has always, or which must be given a compulsory meaning; as denoting obligation. It has a peremptory meaning, and it is generally imperative or mandatory. It has the invariable significance of excluding the idea of discretion, and has the significance of operating to impose a duty which may be enforced, particularly if public policy is in favor of this meaning, or when addressed to public officials, or where a public interest is involved, or where the public or persons have rights which

ought to be exercised or enforced, unless a contrary intent appears; * * *."

It seems clear to us that the only justifiable construction of Minn. St. 1961, § 122.23, is that the Beltrami County superintendent of schools was absolutely obligated to forward the consolidation plat proposed by the school board and that the commissioner of education was absolutely obligated to either approve, modify, or reject the plat when it was submitted to him for review.

■■■ The next issue is whether the action of the commissioner of education and the county superintendent of schools was arbitrary, capricious, and not in the best interests of the whole territory affected. In Irons v. Independent School Dist. No. 2, 119 Minn. 119, 123, 137 N. W. 303, 305, Mr. Chief Justice Start, in speaking for the court, said:

"* * * The statute does not define the term, 'the best interests of the territory;' but it is reasonably clear that it means the best interests of the people in the territory, as we say the best interests of the state, when we are speaking of the best interests of the people thereof. What is for the best interests of the people of a particular territory is a practical, not a legal, question, the solution of which involves a consideration of the interests of the whole territory."

This court in Schweigert v. Abbott, 122 Minn. 383, 387, 142 N. W. 723, 724, said:

"* * * The court will * * * in determining whether the best interests of the territory affected justify a particular consolidation, limit its inquiry to the question whether the proceedings were arbitrary, resulting in unnecessary injustice to those who complain."

■ The commissioner of education, the state consultant for school district reorganization, the chief of elementary and secondary education for the State of Minnesota, and the vast majority of the electorate of the area proposed to be consolidated

have determined that the total welfare of the whole area will be best served by consolidation. The commissioner of education felt that "the objective of getting all of this territory into a district that maintains a full program" would be best accomplished by giving approval to the consolidation plat. We can find nothing in the record to indicate that this determination was arbitrary. Relevant factors entering into the determination are that none of the districts in the consolidated area has ever had a high school and their secondary pupils have been required to go to school in districts outside the area; that the people within the consolidated area had no voice in the government and management of those districts in which their high school children were enrolled in spite of being taxed for the secondary education of these children; and that transportation of the pupils has often been inconvenient and costly, transportation aids in many instances being less than 50 percent of the operating costs.

The combined tentative report shows that the Beltrami, Marshall, and Roseau County school survey committees analyzed the facilities at Goodridge and Middle River. They concluded:

"The Survey Committee's observations of the physical facilities at the Goodridge School for the high school section were considered to be very deficient. It appears that construction over the past years has not been too well projected, the result being that a variety of additions were made to the plant without following a master plan. At the present time plans are being formulated for another partial addition that will still leave the plant lacking proper facilities, thereby causing another program of construction in later years.[2] The old original building is still

---

[2] It appears that even after the consolidation order was issued the Goodridge district went ahead with a sale of bonds for new construction. When this matter was in litigation, a petition was circulated by many freeholders of the Goodridge district requesting that the Goodridge school board refrain from the sale of bonds and cease further construction until the legality of the consolidation was determined. The school board ignored the petition, as well as advice to the same effect given it by the Department of Education.

being retained and because of its high susceptibility to a fire it will still continue to be a fire hazard.

"Observations made of the Middle River plant were that the physical facilities housing the secondary grades were adequate and that maintenance of the plant appeared to be very efficient. The physical plant for the elementary grades, although maintained as well as it could possibly be under the circumstances, need to be replaced. The elementary class rooms are old CCC barracks that have been converted. If this district is to continue as an elementary-secondary district, a new elementary school should be a definite replacement."

Appellants now suggest that if the consolidation is effected, smaller enrollments and assessed valuations in their districts will result in a complete deprivation of state aid to the Goodridge and Middle River schools and, ultimately, in their closing. However, Bertram N. Hendrickson, Department of Education consultant on district reorganization, testified that all existing secondary schools qualify for foundation aid and that even those which have been warned by the department that they are not meeting existing minimum requirements have not been cut off from aid. Moreover, the following language appears in a regulation of the State Board of Education pertinent to the enrollment requirements:

"When any school presently classified cannot meet new and higher minimum enrollment standards, such school, upon application by its school board, may be permitted by the state board of education to retain its present classification."

The testimony of Mr. Hendrickson, as well as the quoted regulation, disposes of appellants' contentions that the consolidation will result in the destruction, immediate or otherwise, of the Middle River and Goodridge school districts. This matter is speculative and does not warrant serious consideration. The record indicates that the representatives of the Department of Education who testified said in effect that at some future time these

two schools may have to be closed, but that if this did happen, it would be to the ultimate advantage of the students as well as the entire area. The mere fact that the Goodridge and Middle River High Schools have in the past met state standards, in part because the Grygla and Gatzke secondary pupils attended those high schools, is not proof that consolidation is not in the best interests of the territory affected.

It appears that the population and assessed valuation of the area proposed to be consolidated are such that its people can have a high school of their own, in the management of which they will be able to participate; located at a point within reasonable distances of the homes of the students; where elementary and secondary students from the same family will be able to be transported to school at the same time, thereby effecting a substantial saving in transportation costs; and where the students can have six years' elementary and six years' secondary education.

Appellants also contend that the best interests of the territory affected were not taken into consideration because the Pennington County survey committee was excluded from the combined study of the area affected by the consolidation plat. The record reveals that they were not invited to participate because the proposal did not include any territory in Pennington County. Despite that fact, the superintendent of the Goodridge school district, who was also the executive secretary of the Pennington County survey committee, and the superintendent of the Middle River district apparently were well aware of the consolidation studies and did voice their suggestions and recommendations concerning the matter.

The entire matter involved on this appeal was thoroughly studied by the survey committees of Beltrami, Marshall, and Roseau Counties, as well as Mr. Stapleton, Mr. Hendrickson, Mr. Engum, and Mr. Johnson, the commissioner of education. The determination of these experts, after exhaustive studies, was that the best solution to the problems in this area would be the consolidation of the Grygla and Gatzke districts and a part of the

Skime district. Furthermore, the people in these districts, who made the ultimate determination as to whether this consolidation should become effective, voted 585 for consolidation to 140 against consolidation. The record clearly establishes that the actions taken by the Beltrami County superintendent of schools and the commissioner of education to effect this consolidation were not arbitrary. We also are required to conclude from the record as a whole that these officials acted within their legislative discretion and that their action must be affirmed.

Affirmed.

MR. CHIEF JUSTICE KNUTSON took no part in the consideration or decision of this case.